BERNICE S. HUGHES, Administratrix of Estate of EDWARD ARTHUR HUGHES, Deceased, Plaintiff and Respondent, v. GREAT NORTHERN RAILWAY COMPANY, Defendant and Appellant.

No. 11644.
Submitted December 19, 1969.
Decided December 30, 1969.
Rehearing Denied January 13, 1970.
462 P.2d 879.

Gough, Booth, Shanahan & Johnson, Cordell Johnson, argued, Edwin S. Booth, appeared, Helena, Weber, Bosch & Kuhr, Havre, for appellant.

Robert D. Morrison, argued, Havre, A. G. Shone, appeared, Butte, for respondent.

MR. JUSTICE CASTLES delivered the Opinion of the Court.

This is an appeal from a judgment entered on a jury verdict in the amount of $65,000. The action was filed in Hill County by a railway employee against the employer under the Federal Employers' Liability Act or F.E.L.A., 45 U.S.C.A. § 51 et seq.

Hughes, the employee, was a long time employee of Great Northern Railway Company, having been employed by it since 1932 at the age of 17. He became a machinist in 1937.

Because of the discussion of the issue to follow, Hughes' history since the year 1952 is important. Hughes hurt his back in 1952. He was treated and wore a back brace. He underwent a spinal fusion in 1955 to correct the back problem. He was in the hospital some nineteen weeks and returned to work eleven months after he got out of the hospital. When he returned to work, he was eventually put to work in the "air room" which was supposed to be light work. Hughes complained that he could not handle the heavy valves. In 1961 Hughes again hurt his back lifting a speed recorder.

Sometime between 1961 and 1965 Hughes tried out a position as a locomotive inspector but found he could not climb with his back brace. He then went back to the air room and was assigned to work on all valves that he could handle.

As to the valves that were overhauled in the air room, some were described by Hughes as small, some were apparently what we will describe as medium, and some were large, requiring help. These large valves were 150 pounds or more in weight and Hughes did not handle them. The ones we describe as medium, Hughes thought weighed about 40 to 50 pounds but they actually weighed 78 pounds.

As to these valves, in Hughes' words on the particular day in question:

"Q. I'm not clear yet as to when you started working on the air brake valves themselves. Do you recall approximately when it was that you started working on air brake valves? A. Well, when I come back from Great Falls after having surgery, they put me on light work.

"Q. Now working on air brake valves, is that what you call light work? A. There is a lot of small valves you can work on.

"Q. Did they shift you over to the heavier valves? A. Yes. Back and forth.

"Q. When did they put you on the heavy valves? A. Well, when I run out of light work, light valves, there was nothing else to do but start working on the heavier ones.

"Q. When did they start doing this, when did they start ordering you to work on these heavier valves? A. Oh, God, right after—I'd say maybe six months after I was in the air room the first time.

"Q. When they asked you to handle the heavy valves, did you object? A. I certainly did.

"Q. To whom did you object? A. I objected to Bob Crook, general foreman, and all the rest of them. I said I couldn't handle them. They said, 'Well, we'll get you some help,' which they did.

"Q. The help that they got you, what did that consist of? A. A couple of apprentice boys to pick the valves up and put them up on the bench, and I tore them apart.

"Q. Did they continue to give you this extra help? A. Well, when they were available.

"Q. Were they always available? A. No, sir.

"Q. What would happen if the help wasn't available? A. I'd just forget about the valves, find something else to do.

"Q. In 1965 when you were handling the valves, did you have any help available then? A. No. Bailey was working on the same type valve I was.

"Q. Were you given a helper to help move these valves? A. No.

"Q. Bailey was doing his work, was he? A. Yes, sir.

"Q. And you were doing yours? A. Yes, sir.

"Q. How long had it been since you had been given any help to move these valves? A. Well, I couldn't say there. Maybe three months.

"Q. Did you complain about the fact that you didn't have any help? A. No, because if I didn't have any help, I just didn't work on the valves, the big, heavy valves.

"Q. I'm still confused here. What do you mean by big heavy valves? A. Well, those that weigh one hundred and fifty, one hundred seventy five pounds.

"Q. The valves that you were working on March 2nd of 1965 were heavy? A. That's a heavy valve, but it's small and compact.

"Q. You mean it is easier to handle? A. It's easier to handle, yes, sir.

"Q. But it weighs a lot? A. It weighs a lot. It weighs a lot more than I ever thought it would weigh. Of course, I weighed—

"Q. Were you given any help to work on these valves, the type you are working on, on March 2nd of 1965? A. No.

"Q. Did you ever ask for help? A. No. I didn't need it.

"Q. Why do you say you didn't need it? A. Well, you go over to the rack and pull the valve off, and you carry it to your chest and walk over and set it down on the bench and take it apart. When you pick it up, you just pick it up to your body. There was no bending, no excessive lifting, and it was compact. You just carry it down to the other end and set it down.

Hughes had additional medical problems during the time including some type of heart condition, and subsequently developed cancer and, at the time of trial, was in grave condition. He subsequently died of cancer. His testimony was entirely by deposition.

Hughes did not return to work after March 1, 1965. He experienced pain continually after that. He had another fusion performed in Rochester on July 10, 1967. In June of 1968 cancer was diagnosed, and by December of 1968 he could not leave the hospital to testify.

As to the air room, it can be said that working conditions were good, a smooth cement floor with a rubber mat, good lighting. On March 1, 1965, Hughes was working at his work bench on a valve. He took it apart, cleaned it, put new gaskets and seals in, and reassembled it. He then "hiked" it up and carried it about 20 feet to the area where the valves are tested. As he turned to put the valve down, he felt a burning sensation in his back. This is the incident giving rise to the complaint charging negligence on the part of the employer.

On this day, Hughes and a co-worker Bailey, were working in the air room. Hughes did not ask Bailey to help him carry the valve. Bailey testified that if Hughes had asked him to help carry the valve he would have helped, he never refused anyone. Bailey also testified, as Hughes did, that the particular valve was considered a valve that could be handled by one man and that all of them handled the valves of that size and type.

Bailey was the local chairman for the labor union that represented the machinists and had on one occasion asked the employer to give Hughes a job in some other part of the shops because Hughes could not lift injectors and could not get along with the men in the injector room. At Bailey's request Hughes was put in the air room.

The single issue determinative of this appeal is whether there is *any* negligence proven sufficient to go to the jury.

The negligence alleged was:

"* * * That defendant negligently forced plaintiff to work lifting and carrying heavy equipment to-wit: an air valve weighing about 45 to 50 pounds, although defendant knew, or should have known, that plaintiff was physically unfitted for such heavy work because of prior injuries sustained by plaintiff."

There simply is no evidence of being "forced" to lift anything. The previously quoted testimony of Hughes shows that the valve was relatively heavy but small and compact

and easy to handle. There was no bending, no excessive lifting. Hughes could look at the valves and determine whether he could handle them and he so testified. Also, the record is clear that after the 1955 surgery, Hughes was given lighter work than he had previously been assigned to. In the machinist line of work the air room was considered light work and even there Hughes testified that when he ran out of light valves and help was not available, he just forgot about the valves and found something else to do.

Respondent's brief suggests that earlier, in the 1950 years, he was warned that if he could not do the work he would not be kept on. Somehow this earlier experience or this threat of layoff seems to be the "force" alleged as negligence. What this argument really amounts to is that the employer was negligent in allowing the employee to work at all.

This being an F.E.L.A. case, the standard laid down by the United States Supreme Court in Rogers v. Missouri Pacific R. Co., 352 U.S. 500, 77 S.Ct. 443, 1 L.Ed.2d 493, reh. den. 353 U.S. 943, 77 S.Ct. 808, 1 L.Ed.2d 764, is stated as follows:

"Under this statute the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought. It does not matter that, from the evidence, the jury may also with reason, on grounds of probability, attribute the result to other causes, including the employee's contributory negligence. Judicial appraisal of the proofs to determine whether a jury question is presented is narrowly limited to the single inquiry whether, with reason, the conclusion may be drawn that negligence of the employer played any part at all in the injury or death. Judges are to fix their sights primarily to make that appraisal and, if that test is met, are bound to find that a case for the jury is made out whether or not the evidence allows the jury a choice of other probabilities. The statute expressly imposes liability upon the employer to pay damages for injury

or death due 'in whole or *in part*' to its negligence. (Emphasis added.)"

▇▇ Under this standard our inquiry is as to whether any evidence of negligence played any part at all in the injury. We recognize that Hughes was in poor physical condition. But we are not prepared to say that allowing a workman to work in the lightest work available in his line is negligence on the part of an employer in even the slightest degree. We have reviewed the record and find no evidence of negligence sufficient to allow the case to go to the jury.

There are other issues discussed in both briefs with many other case citations but it is not necessary to discuss them. The standard of negligence under F.E.L.A. is set out in the Rogers case, supra; and in the instant case, however one might strain, even the slightest degree of negligence is not established.

Accordingly, the judgment is reversed and the cause dismissed.

MR. CHIEF JUSTICE JAMES T. HARRISON, MR. JUSTICES HASWELL and JOHN C. HARRISON, and the HONORABLE LeROY L. McKINNON, District Judge, sitting in place of MR. JUSTICE BONNER, concur.